Victim impact statement Dr Stephen P Moenning Response

Response to first paragraph of Amy  Moenning

I have sent a written docket of information to Mr. Majorie esq. and Mr. Jack Wilkins esq. These 54 separate emails, photos are all intended to support the fact that Amy Moenning was not a victim of John Acker.
These emails support the fact that Amy Moenning had knowledge, benefit, reason to know and was a reasonable person who was not taken advantage of by Mr. Acker.

When I say she had knowledge I am stating over a 10 yr. period Amy Moenning was opening the mail, recording bills to be paid and was active in controlling the financial decisions needed to run a household. She did not fall 'prey' to John Acker.  In addition, these emails show that Amy Moenning signed the tax returns from the years in question.  She is even documented meeting with the IRS agent Ms. Perron. These emails show that Mrs. Moenning did not need any guidance from Mr.Acker. This email evidence also shows that on a 'daily' basis she was proactive and informed about impending financial stresses.

I, Stephen Moenning, disagree with the statement Mr. Acker 'over time he slowly positioned himself to a place of prominence in Steve's life'. Mr. Acker was and is a good friend, even up to today Aug 22,2022. Mr. Acker has invited our family to his home as a guest. Mr. Acker has arranged for my daughter, Emily, to be the only high school student to ever get an apprenticeship on the show 'say yes to the dress'. Mr. Acker also arranged for my oldest daughter to get a summer job at fish restaurant in Destin. He has befriended our family not manipulated it.

We have had financial hardships which resulted in the loss of our home; however, this cannot be blamed upon Mr. Acker. The above-mentioned binder of 54 separate emails document a pattern of behavior involving Mrs. Moenning and myself.  Mrs. Moenning was involved with all aspects of the financial running of this home. Acceptance of these 54 emails is acceptance that they did not come from Mr. Acker.  They came from both Dr. and Mrs. Moenning who claim their own financial destiny.

 I was involved with running my surgery practice during a difficult time for outpatient surgery. I admit I made bad decisions which ultimately resulted in the close sure of my practice.  Mr. Acker was not involved in a sophisticated mind bending, 'elevation' of himself to a position of power enabling him to control our family.  The above mentioned 54 emails and a binder of pictures of our house on the harbor and a nice lifestyle, have been provided to the court, document that Mrs. Moenning did not need any help from Mr. Acker to direct the course of our family.  Not only did she direct our destiny, but she also benefited from it.  She has been involved in the day-to-day functioning of our family.  Unfortunately, this was a financial fall that was self-inflicted by the husband and wife themselves.  We were not victims of Mr. Ackers scam or scheme.

A portion of the letter from Mrs. Moenning discusses the selling of our house. The submitted emails shows and documents, that contrary to her letter to the court, Mrs. Moenning was involved in selling furniture, keepsakes, and other items.  Mr. Acker did not decide to sell our house, keepsakes and art.   Emails document that Mrs. Moenning, not John Acker, was involved in picking the real estate agent.  They show Mrs. Moenning was involved in selling the piano, not Mr. Acker. Signed real estate documents and email correspondence show Dr. and Mrs. Moenning were active in showing the house and signing the contract, not Mr. Acker. Through out her letter to the court, Mrs. Moenning wants the court to view her as a victim. I have submitted copies and original emails on a thumb drive, that document she was not a victim of John Acker's scheme to defraud.  She stated Mr. Acker created 'problems and fabricated' solutions to them. This is not true. I have been fortunate to have saved a number of these emails between myself and my wife that document Mrs. Moenning was not a victim of Mr. Acker. I have copied these emails and placed them in a binder for the courts benefit. This is 'Black and white' evidence that Amy Moenning is not a victim of John Acker. She and Dr. Moenning chartered their own destiny and should be willing to accept it.

Other evidence may be presented which documents that I, Stephen Moenning, did freely give, with no strings attached, John Acker money.  This amount was more than a million dollars, it may be close to 2.4 million.

When I wired Mr. Acker money, it was always a 'gift'. If he paid me back, fine, if he did not, that would not have changed the act of giving him money. Some skeptics may ask 'why would you have continued to give him money? '

The friendship I have with Mr. Acker is characterized by an Agope friendship. Frequently mentioned in the Bible, Agope friendship has a quality where the persons cares more for the other individual than himself. Another example of agape friendship is the parent of an alcoholic child willing to give unlimited amounts of love to his/her child.  How many times have we heard someone say, 'if that were my kid, I would give up on him/her. Not another cent!'  Agope friendship never gives up, just like Agope love, it will never give up.

 In this situation, we happen to be talking about money as the commodity not Love. To that end, some of the wires may say 'loans' 'gift', this was upon the recommendation of the banker who told me 'just put anything down', it does not matter. No matter what was put on the wire documents, I am here to say it was a 'gift' freely given to my friend who said he needed it. John Acker did not worm his way into our life. He did not perform mind control techniques on our family. He is a friend.

Thank-you,

Steve Moenning

# United States Tax Court

# Docket number 15883 – 19

Amy D Moenning, petitioner
and Stephen P Moenning, intervenor
v. Commissioner of Internal Revenue,
respondent.

Proposed Stipulation of facts

1    Both parties acknowledge receipt from Stephen P Moenning, intervenor, to IRS counsel and
     counsel for petitioner Amy D Moenning, regarding 54 separate texts, emails, photos supported by
     a thumb drive of evidence pertaining to docket number 15883-19 – sent to the above parties via
     certified mail.

2    Both parties acknowledge IRS collection years in question include 2013, 2014, 2015 and innocent
     spouse request was filed in 2019 (4 yrs. post 2015)

3    Both parties paid daily bills for the years in question 2013, 2014, 2015 (Tabs 2,3,4,5 (see subject
     line),6,7,8,9,10,11,13,14,39,50,51,52,53)

4    Both parties open mail including mail from the IRS communications with IRS, utility bills, mortgage
     bills, during the years in question 2013, 2014 and 2015.(Tabs 2,6,7,8,9,14,50,51,52,53)

5    Both parties signed IRS tax returns for the years in question of 2013, 2014 and 2015. (Tab 9,
     other forms signed per IRS)

6    Both parties participated in financial decisions to send their children to private or out-of-state
     colleges during the years 2013 2014 2015 ( University of Virginia+ RISD; Rhode Island school of
     design )(Tab 38,49). They also acknowledge 2 out of 3 children, during 2013,2014,2015 had full
     'in-state' scholarships

7    Both parties participated in decisions to send their youngest daughter to summer camp for four
     weeks at a cost of $4000 (Greystone in North Carolina 2013)(Tab 45 petitioner wants explanation
     from the intervenor why $4000 camp payment is late)(photo documentation)

8    Both parties jointly owned and lived in a 1.45-million-dollar house in Charlotte County on Charlotte
     Harbor at 1950 Jamaica Way, Punta Gorda, FL ( house sold in 2014 for 1.45 million) (photos)

9    During 2013 Both parties owned jointly titled luxury vehicles Lexus LS 430 as well as a Lexus LS
     470 (Tab 12 petitioner sending intervenor email about buying a new car during 2015)

10   Both parties were married on October 19,1991

11   Both parties agree during the years in question from 2013,2014,2015 both couples were living
     together, married, residing at the same address. 1950 Jamaica Way Punta Gorda Fl.

12   Both parties agree that Amy D Moenning petitioner, initiated divorce proceedings against
     intervenor Stephen P Moenning in 2017, 2 yrs. after the tax years in question. This divorce is still
     going on, but both parties remained married but separated.

13   Both parties agree that the IRS garnished wages from the joint accounts of Amy D Moenning and
     Stephen P Moenning, in the fall of 2014 from regions Bank. This resulted in a zero balance for
     both parties.  Both parties were aware of joint account garnishment in 2014.(tab8, petitioner will
     confirm this as well since balance was 'zero' for days impacting her ability to pay bills)

14   Both parties agree petitioner Amy D Moenning, met with IRS agent Jacquelyn Perron, IRS
     Employee number 10-00885003, at our address 1950 Jamaica Way, Punta Gorda, FL, 33950 to
     discuss our joint IRS liability, (Tab 42)

## Marital Status
Intervenor and petitioner are currently separated but still married. The Petitioner filed for divorce from the intervenor in April 2017, two years after the most recent non-payment year of 2015 and 4 years after the initial non- payment year of 2013. During the years of IRS non-payment the intervenor and petitioner were married, living together in the same home at 1950 Jamaica Way Punta Gorda Florida in Charlotte County.

## Reason to Know
Petitioner had 'Actual Knowledge' of IRS debt and lack of payment. She has personally met with the IRS agent Jacqueline Perron,at the couples' house, she (petitioner) opened the correspondence from the IRS and on her own volition contacted the intervenor (see email correspondence index). After the joint bank account garnishment, and inability to pay bills, 'a reasonable person', in similar circumstances, would understand that both parties owed monies that had not been paid to the IRS. After three consecutive years of jointly signing and not paying the IRS amount a 'reasonable person' would have exercised their right to object and redirect funds to pay treasury debt, not push for out of state colleges, private camps, Broadway shows and vacations to New York City, North Carolina, Ohio and Brooklyn during 2013. Petitioner had a 'reason to know' as petitioner actively paid bills, bought groceries, participated in the selling of major assets (home, piano, furniture, automobiles). Petitioner had 'full knowledge' of the unpaid taxes for the years in question, after she had paid the bills for the previous 23 years of the marriage.  She opened the IRS mail, met with the IRS agent, decided how to communicate these issues to the intervenor.

## Legal obligation
The IRS obligation covers the years of 2013,2014and 2015. During those years, the petitioner and the intervenor were married, living in the same house, and both managing finances. Both parties were paying bills (see emails) and jointly managing financial matters.

## Benefit
Petitioner has **'benefited'** from the non -payment of these taxes. During the years in question both intervenor and petitioner went on 6 out of state vacations, lived in a 1.45-million-dollar luxury home on Charlotte harbor, enjoyed a $25,000 Yamaha concert grand piano in the home, enjoyed fine art work in the home, shared jointly owned luxury vehicles, sent their children to the finest out of state colleges ($100,000/yr tuition for Univ Virginia and Rhode Island School of Design) in spite of 'in-state' full ride scholarships. They sent their children to $4000 summer all girls camps at the petitionors insistence. (see attached email and picture- exhibits)

## IRS Compliance
The intervenor is currently paying the jointly shared obligations ($4378/month) .

**Summary**

Docket 15883-19 demonstrates materials of 54 separate texts, emails, photos supported by a thumb drive, all of which is evidentiary in nature. Additionally supplied:

1) 16 pictures of the interior of the $1.45 Million-dollar home including expensive furniture/artwork/concert piano.

2) Jan 12, 2015 signed (by both the petititioner and intervenor) final contract of the jointly owned $1.45 Million home

3) This evidence has been shared with the IRS and the petitioner council. This evidence shows the petitioner had 'full knowledge', 'actual knowledge' and 'reason to know' of the lack of payment to the IRS. Further, any 'reasonable person' in her station would have understood there was a debt owed to the IRS, after meeting with the IRS agent, personally opening collection mail from the IRS and after personally having funds from a joint bank account garnished by the IRS. The intervenor and the petitioner were married in Oct 1991, thus they were married in the years in question of 2013,2014, 2015 and are still married. For the first 23 yrs of the marriage, the petitioner paid all the bills including the IRS commitments.

As a result of knowledge, benefit, reason to know and the reasonable person test, marital status, the intervenor asks the court to once again deny the petitioners request for relief of her tax liability. The court should consider the IRS debt equitably distributed by both parties. I thank the court for the opportunity to present my 'pro se' defense.

Respectfully,

Steve Moenning

**Michael Saunders & Company**

## Residential Contract For Sale And Purchase
THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR

**PARTIES:** STEPHEN D MOENNING ("Seller");
and CHRISTOPHER G FREELAND                    AMY P MOENNING
                                              SHAUNE G HOTCHKISS ("Buyer");
agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
(collectively "Property") pursuant to the terms and conditions of this Residential Contract For Sale And Purchase and
any riders and addenda ("Contract"):

1. **PROPERTY DESCRIPTION:**
   (a) Street address city zip 1950  JAMAICA WAY          PUNTA GORDA      FL   33950-4217
   (b) Property is located in   Charlotte   County, Florida, Real Property Tax ID No.  41-22-11-251-008
   (c) Real Property: The legal description is PGS: 010 0995 0062 PUNTA GORDA ISLES SEC10 BLK95 LT 6 1624/2014 1764/532

   together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and attached
   wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or by other terms
   of this Contract.
   (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items which
   are owned by Seller and existing on the Property as of the date of the initial offer are included in the purchase:
   range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s), drapery rods and
   draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security gate and other access
   devices, and storm shutters/panels ("Personal Property")
   Other Personal Property items included in this purchase are:

   Personal Property is included in the Purchase Price, has no contributory value and shall be left for the Buyer.
   (e) The following items are excluded from the purchase:

### PURCHASE PRICE AND CLOSING

2. **PURCHASE PRICE** (U.S. currency):                                              $  1,450,000.00
   (a) Initial deposit to be held in escrow in the amount of (checks subject to COLLECTION)  $   10,000.00
   The initial deposit made payable and delivered to "Escrow Agent" named below
   (CHECK ONE): (  ) ☒ accompanies offer or (b) ( ) is to be made within ____ (if left blank,
   then 3 days) after Effective Date. IF NEITHER BOX IS CHECKED, THEN OPTION (b)
   SHALL BE DEEMED SELECTED.
   Escrow Agent Information: Name    Michael Saunders & Company
   Address 101 TAYLOR STREET PUNTA GORDA, FL     33950
   Phone    941-639-0000    E-mail  SHAUNEHOTCHKISS@GMAIL.COM Fax  941-639-0101
   (b) Additional deposit to be delivered to Escrow Agent within ____ (if left blank, then 10)  $
   days after Effective Date.
   (All deposits paid or agreed to be paid, are collectively, referred to as the "Deposit")
   (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8   $  1,150,000.00
   (d) Other
   (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire,  $    290,000.00
   transfer or other COLLECTED funds
   NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.

3. **TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
   (a) If not signed by Buyer and Seller and an executed copy delivered to all parties on or before  5:00PM
   1/12/2015   this offer shall be deemed withdrawn and the Deposit, if any, shall be returned to
   Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day the
   counter-offer is delivered.
   (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or initialed
   and delivered this offer or final counter-offer ("Effective Date").

4. **CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur and
   the closing documents required to be furnished by each party pursuant to this Contract shall be delivered ("Closing") on
   or before 02/25/15  ("Closing Date"), at the time established by the Closing Agent.

5. **EXTENSION OF CLOSING DATE:**
   (a) If Closing funds from Buyer's lender(s) are not available at time of Closing due to Truth in Lending Act (TILA) notice
   requirements, Closing shall be extended for such period necessary to satisfy TILA notice requirements, not to
   exceed 7 days.

Buyer's Initials _____  _____     Page 1 of 12     Seller's Initials _____  _____

*Instanet forms*

---

1.45 Million $ sell price of jointly owned home Feb 25,2015 signed by both petitioner and intervenor

# Jointly shared home videos / pictures/ assets



1950 Jamiaica Way interior of jointly owned home, showing custom beveled glass front door($25,000), solid cherry floors (6000 sq ft) during 2013-2015



1950 jamaica way quality kitchen granite, 3 sinks, 3 ovens, gas stove built in TV, artwork



1950Jamaica Way home, shot of girls bedroom demonstrates quality of jointly owned home 2013-2015



1950 Jamaica Way home: 6000 sq ft of solid cherry flooring vertical cut, Yamaha concert piano($25,000), original New Orleans art work($5000)
Jointly owned home  2013-2015



1950 Jamaica Way Punta Gorda Florida  2013-2015
Jointly owned and enjoyed home
Charlotte Harbor 'pool' view of $1.45 million home imported key west 'coral' as the lanai



1950 Jamaica Way Punta Gorda Florida interior living room with Yamaha concert piano and
original oil painting from New Orleans
Jointly owned and enjoyed assets during 2013-2015



1950 Jamaica Way Punta Gorda Florida
Jointly owned home 2013-2015
Custom staircase with demonstration of a portion of custom impact resistant bevel glass windows



Sunset
1950 Jamaica Way Punta Gorda Florida
Jointly owned 1.45 million home 2013-2015

2013-2015 vacations by both petitioner and intervenor

2013 North Carolina trip to go to $4000 summer all girls camp-Greystone. Petitioner and Intervenor



2013 joint petitioner and intervenor trip to Brooklyn NY to view Pratt School of art
Video interview while at Pratt in Brooklyn (right click then select play) video deleted for privacy, unable to 'black it out'.



2013 airplane pic of petitioner and intervenor on way to Brooklyn

2013 Ohio vacation Petitioner and daughters took to visit relatives



NYC 2013 family vacation with petitioner and intervenor 2 wks in city, hotel stay and broadway



Joint family vacation in NYC 2013 Broadway show. Petitioner enjoyed with children. Intervenor had returned home for later half of vacation while Petitioner stayed with family in NYC



Petitioner above in blue flower jacket taking picture of klinefeld's manhattan  2013 as part of 2-3 wks in NYC  $10,500 vacation



Ace Hotel where family stayed in downtown NYC for 2 wks in 2013 while daughter did internship at Klinefelds 'say yes to the dress'.

2013 Rhode Island Vacation to visit Rhode Island School of Design



Petitioner on plane to RISD school 2013 vacation

2013 Petitioner and Intervenor vacationing in Providence RI at Rhode Island School Design



2013 Providence Rhode Island vacation at RISD library $51,000 /annual tuition



2013 family trip to Camp Greystone $4000 summer camp Petitioner

